**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DEVIN JAMES MARAVEL,        )
                               )
                Plaintiff,    )
                               )
                v.           )      1:20CV624
                               )
ANDREW M. SAUL,          )
Commissioner of Social Security,  )
                               )
                Defendant.    )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Devin James Maravel, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Adult Child's Disability Benefits ("CDB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 15; see also Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

**I. PROCEDURAL HISTORY**

Plaintiff applied for CDB and SSI (Tr. 268-74), alleging a disability onset date of July 1, 2008 (see Tr. 268, 269).[1]

---

[1] Plaintiff filed two applications for CDB, one based upon the earnings record of his disabled mother, and the other based on the earnings record of his

(continued...)

Following denial of those applications initially (Tr. 69-110) and on reconsideration (Tr. 111-73, 177-86), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 187-89). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 36-68.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 12-27.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 264-67, 401-04), thereby making the

---

[1] (...continued)
deceased father. (See Tr. 15, 268.) To qualify for CDB, an individual must, at the time of application, 1) remain unmarried, 2) remain a dependent of the person(s) on whose earnings record(s) the individual bases his CDB claim(s), and 3) either not have attained the age of 18 or have attained the age of 18 and remain under a disability which began before the individual attained the age of 22. See 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5). Plaintiff filed his CDB applications shortly after attaining the age of 18, and the ALJ adjudicated Plaintiff's CDB claims before Plaintiff attained the age of 22. (See Tr. 17, 27, 268.) Thus, to qualify for CDB, Plaintiff must, at a minimum, show that he remained disabled as of November 22, 2016, the date he filed his CDB applications. See Smolen v. Chater, 80 F.3d 1273, 1280 (9th Cir. 1996) (holding that CDB "claimant must be disabled continuously and without interruption beginning before her twenty-second birthday until the time she applied for [CDB]"). Similarly, notwithstanding Plaintiff's onset date of July 1, 2008, Plaintiff lacked eligibility for SSI benefits until his application date of October 6, 2016. See 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until the date he or she files an SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates the first month he or she satisfies the eligibility requirements, which cannot precede the application date). Threshold eligibility requirements aside, the standards for demonstrating disability in a CDB claim match those of claims for SSI. See 42 U.S.C. § 402(d) (providing that 42 U.S.C. § 423(d) supplies applicable definition of "disability" for CDB claims); 42 U.S.C. § 423(d)(1)(A) (setting forth standard definition of "disability" for Disability Insurance Benefits ("DIB") claims, i.e., "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A) (describing same standard of disability for SSI claims); see also Craig v. Chater, 76 F.3d 585, 589 n.1 (4th Cir. 1996) ([DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are . . . substantively identical."(internal citations omitted)).

ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings:

1. . . . [Plaintiff] had not attained age 22 as of July 1, 2008, the alleged onset date.

2. [Plaintiff] has not engaged in substantial gainful activity since July 1, 2008, the alleged onset date.

. . .

3. [Plaintiff] has the following severe impairment(s): fibromyalgia, hypertension, gastroesophageal reflux disease (GERD), obesity, Asperger's Disorder, post-traumatic stress disorder [("PTSD")], mood disorder, and bipolar affective disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except he has frequent use of bilateral upper and lower extremities for pushing, pulling, or hand and foot controls and frequent use of bilateral upper extremities for handling, fingering, and feeling. He can occasionally climb ramps, stair, ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can have frequent exposure to extreme heat and cold, unprotected heights, and moving mechanical parts. He can understand and carry out a variety of complex and simple instructions, but can only sustain attention to perform simple tasks in an environment with no work-related contact with the general public and only occasional interaction with coworkers.

. . .

3

6.    [Plaintiff] has no past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from July 1, 2008, through the date of this decision.

(Tr. 17-27 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial

4

evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving

5

a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u>

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473, 475

n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to

---

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he [ALJ]'s finding that [Plaintiff] does not meet a Mental Disorder Listing is not supported by substantial evidence" (Docket Entry 14 at 3 (bold font and single-spacing omitted));

2) "[t]he ALJ committed error by failing to include schizoaffective disorder and anxiety disorder as severe impairments" (id. at 12 (bold font and single-spacing omitted)); and

---

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

3) "[t]he mental RFC is not supported by substantial evidence" (id. at 15 (bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 16 at 12-22.)

## 1. Listings 12.04, 12.10, and 12.15

In Plaintiff's first assignment of error, he asserts that "[t]he [ALJ]'s finding that [Plaintiff] does not meet a Mental Disorder Listing is not supported by substantial evidence." (Docket Entry 14 at 3 (bold font and single-spacing omitted).) In particular, Plaintiff maintains that he met the requirements of Listings 12.04 ("Depressive, bipolar and related disorders"), 12.10 ("Autism spectrum disorder"), and 12.15 ("Trauma- and stressor-related disorders"), because his mental impairments caused extreme limitation in his abilities to interact with others (see id. at 6-8), concentrate, persist, or maintain pace ("CPP") (see id. at 8-9), and adapt/manage himself (see id. at 9-11). Plaintiff further contends that "[t]he ALJ used *non sequiturs* in her [listings] analysis," in that "[t]he facts she cited did not support the conclusions she reached." (Id. at 11.) Plaintiff additionally faults the ALJ for neither "discuss[ing] the detailed daily records of Turning Point that specifically address the B criteria" of the listings at issue, nor analyzing "how [Plaintiff]'s autism and hallucinations affect his concentration or his interaction with others." (Id.) Those contentions fail to warrant relief.

9

"Under Step 3, the [SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in [A]ppendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted). "The listings set out at 20 CFR [P]t. 404, [S]ubpt. P, App['x] 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of th[e] criteria [in a listing], no matter how severely, does not qualify.").

The ALJ here apparently assumed without express analysis that Plaintiff's mood disorder/bipolar affective disorder, Asperger's disorder, and PTSD met the paragraph A criteria of Listings 12.04, 12.10, and 12.15, respectively, and proceeded to analyze whether Plaintiff could meet the requirements of paragraphs B and C of those listings, ultimately concluding that he could not do so.

(See Tr. 18-19.)  Moreover, Plaintiff has not challenged the ALJ's determination that Plaintiff's mental impairments failed to satisfy the paragraph C criteria of Listings 12.04, 12.10, and 12.15.  (See Tr. 19; see also Docket Entry 14 at 3-11.)  Thus, the relevant inquiry focuses on whether substantial evidence supports the ALJ's findings with respect to the paragraph B criteria of the listings in question.

Paragraph B of Listings 12.04, 12.10, and 12.15 all require proof that the condition documented via Paragraph A resulted in at least "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

　　1. Understand, remember, or apply information[;]

　　2. Interact with others[;]

　　3. Concentrate, persist, or maintain pace[; and]

　　4. Adapt or manage oneself."

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.10B, 12.15B (internal citations omitted) (emphasis added).  In this context, to qualify as "marked," a limitation must "seriously" restrict the ability to function "independently, appropriately, effectively, and on a sustained basis."  Id., § 12.00F.2.d (emphasis added); see also 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) (explaining that "marked" represents the fourth-highest of five levels, below "extreme," but above "none, mild, [and] moderate"); and an "extreme" limitation means an individual has no "ab[ility] to function . . . independently, appropriately, effectively, and on

11

a sustained basis," id., § 12.00F.2.e. The ALJ here found that Plaintiff's mental symptoms caused no limitation in Plaintiff's ability to understand, remember, and apply information and moderate limitation in his abilities to interact with others, maintain CPP, and adapt/manage himself. (See Tr. 19.) Plaintiff has challenged the ALJ's findings with respect to interaction, CPP, and adaptation/self-management. (See Docket Entry 14 at 3-11.)

a. Interaction

The ALJ provided the following analysis regarding Plaintiff's ability to interact with others:

> In interacting with others, [Plaintiff] has a moderate limitation. Medical records showed that [Plaintiff] has [PTSD], mood disorder, and bipolar affective disorder, requiring medications. He seems to respond well to medications. He has friends who he socializes with. He said he does not like to be around others and has difficulty making friends. He has no recent inpatient hospitalization. He can only sustain attention to perform simple tasks in an environment with no work-related contact with the general public and only occasional interaction with co-workers.

(Tr. 19 (emphasis added).) Plaintiff challenges multiple aspects of the ALJ's above-quoted analysis, none of which ultimately carry the day.

Plaintiff first objects to the ALJ's observation that Plaintiff "seem[ed] to respond well to medications" (Docket Entry 14 at 6 (referencing Tr. 19)), arguing that Plaintiff "t[ook] a single medication - [W]ellbutrin for depression" and, "[a]ssuming arguendo [Plaintiff wa]s responding to [W]ellbutrin, that has no relevance as to Asperger's Disorder[, which] is a developmental

12

disorder affecting the individual's ability to effectively socialize and communicate" (id.). In that regard, Plaintiff faults the ALJ for "not discuss[ing] how Asperger's Disorder affects [Plaintiff]'s ability to interact with others." (Id.)

The ALJ did not prejudicially err by omitting an express discussion of Plaintiff's Asperger's disorder in the above-quoted analysis, because the ALJ's overall decision makes clear she adequately considered the impact of Plaintiff's Asperger's disorder on his ability to function socially. At step two, the ALJ expressly found Plaintiff's Asperger's disorder to qualify as a severe impairment (see Tr. 18), thus finding that Plaintiff's Asperger's disorder significantly limited his ability to perform work-related mental activities, see 20 C.F.R. § 404.1522(a), 416.922(a). Then, in the ALJ's evaluation of Plaintiff's RFC, the ALJ acknowledged that 1) "[a] Child Diagnostic Evaluation from UNC TEACCH Center in April 2009 show[ed Plaintiff] was diagnosed with Asperger's Disorder" (Tr. 21), 2) at Holly-Hill Behavioral Health System hospital in January 2010, Plaintiff exhibited "suicidal thoughts, hallucinations and paranoid thinking" and "received treatment for bipolar disorder and Asperger's syndrome" (id. (emphasis added)), 3) Plaintiff "was hospitalized in September 2012 for agitation and aggression along with hallucinations[ and ] was diagnosed with . . . Asperger's disorder by history" (id. (emphasis added)), 4) Plaintiff "received residential services from September 27, 2013 through April 3, 2015, [at Solutions Community Support

13

Agency] for [PTSD], autism spectrum disorder, Tourette's Disorder and obsessive compulsive disorder[, ] <u>did not exhibit any aggressive behaviors</u> during his short stay in the level II facility[, ] <u>met [his] goal</u>[,] and was discharged" (Tr. 22 (emphasis added)), 5) "[f]rom October 6, 2014 through July 13, 2015, [Plaintiff] attended [the Turning Point] day treatment program where he . . . was diagnosed with Asperger's disorder and depression . . . [but] <u>had difficulty connecting to other students</u>, particularly since he was gifted academically" (<u>id.</u> (emphasis added)), 6) at a "psychological consultative evaluation on February 22, 2017, performed by Donna Mansour, licensed psychological associate [("LPA Mansour")] and Christopher Clougherty, Ph.D., supervising psychologist," LPA Mansour noted that Plaintiff "ha[d] a diagnosis of depression and autism, which d[id] seem consistent with his presentation," "<u>was very nervous at times and likely had some awkward mannerisms that could cause some issues relating to coworkers and supervisors</u>," but that Plaintiff "<u>felt that he had the ability to conform to social standards, comply with rules, and cooperate with others</u>" (<u>id.</u> (emphasis added); <u>see also</u> Tr. 24 (reflecting ALJ's remarks that Plaintiff's "Asperger's manifest[ed] itself as <u>social awkwardness</u> rather than limited cognition," that Plaintiff did "have some limitations related to mental health issues . . . but they [we]re not disabling," and that the RFC "provide[d] limitations to social interaction consistent with the evidence in the record")). That discussion supports the ALJ's

14

finding that Plaintiff's mental impairments, including Asperger's disorder, caused Plaintiff to suffer <u>moderate</u> limitation, i.e., had "<u>fair</u>" ability to function "independently, appropriately, effectively, and on a sustained basis," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c (emphasis added), in his ability to interact with others.[5]

Plaintiff further contends that "the ALJ contradict[ed] herself" by "stating [Plaintiff] 'has friends who he socializes with,'" but then remarking that Plaintiff "'said he does not like to be around others and has difficulty making friends.'" (Docket Entry 14 at 7 (quoting Tr. 19).) However, that argument fails for two reasons. First, both of the ALJ's above-quoted remarks are based on Plaintiff's <u>own statements</u> (<u>see</u> Tr. 49-50 (documenting Plaintiff's testimony that he had friends whom he visited and that, the day before the hearing, he had spent time with friends he had not seen in awhile), 50 (recording Plaintiff's statement that he found it "hard" to make friends due to nervousness)) and thus, to the extent the statements do contradict one another, the ALJ simply

---

[5] As discussed above, Plaintiff must show that his mental impairments caused listing level limitations in his ability to function mentally <u>as of the time of his application dates</u> – October 6, 2016 (SSI) and November 22, 2016 (CDB). Although mental health records discussed by the ALJ from 2009 to mid-2015 showed that Plaintiff suffered greater levels of mental dysfunction during that time, the records from mid-2015 to the date of the ALJ's decision demonstrated significant improvement in Plaintiff's mental symptoms. (<u>See</u> Tr. 21-23; <u>see also</u> Tr. 24 (containing ALJ's observations that Plaintiff "experienced significant traumatic events during childhood after his father passed away, including his mother engaging in substance abuse and not having custody of [Plaintiff] for a time[, but n]ow, as an adult, he and his mother have repaired their relationship, she has stayed sober, and they support each other").)

15

fulfilled her duty to deal with conflicting evidence. Second, that argument glosses over the fact that, in finding a moderate limitation in Plaintiff's ability to interact with others, the ALJ necessarily found evidence that supported some limitation in that area, while also noting evidence that failed to support greater limitations.

Next, Plaintiff argues that "the notes from the Turning Point Day Treatment program document [Plaintiff] ha[d] an extreme limitation interacting with others . . . and acting in a socially appropriate manner" (Docket Entry 14 at 7 (citing Tr. 514, 520, 524, 526, 530, 541, 543, 545, 549, 551, 553, 555, 567, 570, 572, 574, 575, 578, 582, 585, 587, 598, 601, 602, 604, 607, 614, 615, 621, 628, 629, 652, 659, 698, 717, 751, 768)), as well as "an extreme problem accepting authority and following instructions" (id. (citing Tr. 514, 520, 524, 526, 530, 543, 545, 553, 555, 567, 570, 572, 578, 582, 586, 588, 598, 601, 607, 615, 628, 629, 659, 702, 713, 717)). Plaintiff additionally notes that "[t]he ALJ did not discuss the Turning Point records." (Id.)

As an initial matter, as quoted above, the ALJ did discuss Plaintiff's treatment at Turning Point, noting that, "[f]rom October 6, 2014 through July 13, 2015, he attended [the Turning Point] day treatment program where he received academic instruction along with mental health treatment[, ] was diagnosed with Asperger's disorder and depression . . . [but] had difficulty connecting to other students, particularly since he was gifted

16

academically." (Tr. 22 (emphasis added).) Moreover, although the ALJ did not expressly recite the daily details of Plaintiff's treatment at Turning Point (see id.), the ALJ labored under no obligation to discuss every piece of evidence in the record. See, e.g., Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). Furthermore, Plaintiff has not shown how a remand for the ALJ to further discuss the 2014-15 Turning Point records would lead to a different result in this case. To qualify for CDB and SSI, Plaintiff must show that he remained disabled as of his application dates of October 2 and November 22, 2016, respectively. As discussed above, and as the ALJ acknowledged (see Tr. 24), although records from 2009 to mid-2015 (including the Turning Point records) show that Plaintiff suffered from greater limitations in his ability to interact with others (see, e.g., Tr. 1010-13, 1017-19, 1022-24, 1042-54, 1512-18, 1526-29, 1534-44, 1594-1677), records since mid-2015 demonstrate improvement in his symptoms (see, e.g., Tr. 428-34, 444-46, 458-61, 467-70, 488-90, 497-500, 914-18, 923-24, 973-76).

Plaintiff also maintains that "the ALJ's statement that [Plaintiff] 'has no recent inpatient hospitalization' is a *non sequitur*" (Docket Entry 14 at 7 (quoting Tr. 19)), because "[i]t has no bearing on [Plaintiff]'s ability to interact with others" (id.). According to Plaintiff, he "can have an extreme limitation

17

on interacting with others and have no need for inpatient hospitalization." (Id. at 7-8.) Contrary to Plaintiff's allegation, the fact that Plaintiff had no recent psychiatric inpatient hospitalizations does hold relevance to an assessment of his ability to interact with others. Indeed, Plaintiff's aggression towards himself and others and other inappropriate social behavior triggered many of Plaintiff's prior psychiatric inpatient hospitalizations, as well as his stints in group homes. (See, e.g., Tr. 1010-13, 1017-19, 1022-24, 1042-54, 1516-17, 1526-29, 1657-58.) Thus, the absence of any psychiatric inpatient hospitalizations (or group home stays) since mid-2015 provides support for the ALJ's finding that Plaintiff's mental impairments improved over time and now caused only moderate limitation in his ability to interact with others.

Additionally, Plaintiff asserts that "the records from the consulting examiners indicate [Plaintiff] ha[d] difficulty interacting with others" (Docket Entry 14 at 8), pointing out that consultative medical examiner Mike Dearinger, D.O., noted Plaintiff "'was anxious and constantly moving about the exam room[, ] had a strange effect [sic][, and] was very sweaty'" (id. (quoting Tr. 790)). Plaintiff also singles out the following observations of LPA Mansour as supporting extreme limitation in Plaintiff's ability to interact with others:

- "'[Plaintiff] is described as getting very easily angered and agitated with changes in his routine, which

18

could cause issues relating to others'" (<u>id.</u> at 8 (quoting Tr. 800) (emphasis added));

• "'[h]e is <u>described</u> as isolating himself from others because of depression and pain'" (<u>id.</u> (quoting Tr. 800) (emphasis added));

• "'[h]e does have a diagnosis of depression and autism, which do seem consistent with his presentation'" (<u>id.</u> (quoting Tr. 802));

• "'[h]e was very nervous at times and likely has <u>some</u> awkward mannerisms that <u>could</u> cause <u>some</u> issues relating to coworkers and supervisors'" (<u>id.</u> (quoting Tr. 802) (emphasis added)); and

• "'[h]e is <u>described</u> as having great difficulty tolerating changes in his routine as well as stress and pressures'" (<u>id.</u> (quoting Tr. 802) (emphasis added)).[6]

As an initial matter and as emphasized above, three of the six statements upon which Plaintiff relies constitute LPA Mansour's mere recitations of Plaintiff's <u>subjective</u> symptom reports, rather than LPA Mansour's <u>objective</u> observations of Plaintiff's behavior during the examination or other independent verification. (<u>See</u> Tr. 800, 802.) The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision" (Tr. 24) and, as discussed below in the context of Plaintiff's third assignment of error, Plaintiff has not demonstrated error with respect to that finding. Thus, Plaintiff's above-quoted

_____

[6] LPA Mansour ultimately concluded that Plaintiff could understand, retain, and follow instructions and could sustain attention sufficiently to perform simple, repetitive tasks. (<u>See</u> Tr. 802.)

19

statements (recounted by LPA Mansour) would not have <u>compelled</u> the ALJ to find marked (let alone extreme) limitation in Plaintiff's ability to interact with others. The three remaining statements at issue actually harmonize with the ALJ's findings that Plaintiff's Asperger's disorder constituted a severe impairment (<u>see</u> Tr. 18), manifested as social awkwardness (<u>see</u> Tr. 24), caused moderate limitation in Plaintiff's ability to interact with others (<u>see</u> Tr. 19), but did not qualify as disabling (<u>see</u> Tr. 19, 24).

Lastly, Plaintiff argues that "the longitudinal evidence is persuasive" because, "[s]ince dropping out of Turning Point six years ago, [Plaintiff] has not attended school, has not worked, [] <u>has not participated in any social activities</u>[, and ] <u>lives the life of a recluse</u> with his mother providing for all his needs." (Docket Entry 14 at 8 (emphasis added).) Although the record does show that Plaintiff has neither attended school nor performed any substantial gainful activity since dropping out of the Turning Point program in 2015, the record refutes Plaintiff's claim that, during such time, he did not "participate[] in <u>any</u> social activities" and "live[d] the life of a <u>recluse</u>" (<u>id.</u> (emphasis added)). In that regard, Plaintiff (A) testified at the hearing in May 2019 that he had friends whom he visited and that, the day before the hearing, he had spent time with friends he had not seen in awhile (<u>see</u> Tr. 49-50) and (B) stated, on a Function Report dated December 9, 2016, that he could go out alone (<u>see</u> Tr. 316), participated in social gatherings as a hobby (<u>see</u> Tr. 317), talked

20

and joked with others (see id.), and experienced no problems getting along with others (see Tr. 318) or respecting authority (see Tr. 319). Plaintiff additionally told LPA Mansour in February 2017 that he could conform to social standards and rules, as well as that he could cooperate with others. (See Tr. 800.)

In short, Plaintiff has neither established prejudicial error by the ALJ in her evaluation of Plaintiff's ability to interact with others, nor pointed to evidence that would have compelled the ALJ to find marked (or extreme) limitation in that functional area.

b. CPP

Here, the ALJ offered the following explanation for finding moderate limitation in Plaintiff's ability to maintain CPP:

> With regard to [CPP], [Plaintiff] has a moderate limitation. Medical records showed that [Plaintiff] has [PTSD], mood disorder, and bipolar affective disorder. He reported concentration issues that would interfere with work activity. However, he watches television, plays video games and does research on the internet. He can sustain attention and follow instructions.

(Tr. 19 (emphasis added).) Plaintiff objects to the ALJ's analysis on three grounds; however, none of those grounds have merit.

First, Plaintiff maintains that the ALJ's reliance on Plaintiff's above-emphasized leisure activities constitutes a "*non sequitur*," because "[t]he act of watching TV, playing video games or surfing the internet provides no information about how long the individual can concentrate" (Docket Entry 14 at 9 (emphasis added)), and "[t]he ability to perform simple tasks differs from

21

the ability to stay on task" (id. (citing Mascio v. Colvin, 780
F.3d 632, 638 (4th Cir. 2015))). Plaintiff's argument fails,
because his own statements reflect "how long [he] c[ould]
concentrate" (id.). Plaintiff testified at the hearing that he
usually woke up at 4 am and read, played video games, or used his
computer until 8 or 9 am, i.e., a time period of four to five
hours. (See Tr. 50.) He later testified that he watched videos on
YouTube, looked at the news, and played video games that involved
history "for a couple of hours." (Tr. 61 (emphasis added); see
also Tr. 21 (containing ALJ's acknowledgment of Plaintiff's
testimony that, "in a typical day[,] he goes on-line and watches
funny videos or the news[ and ] enjoys playing video games for a
couple of hours" (emphasis added)).) Thus, Plaintiff's own
testimony provided the ALJ with a basis to gauge "how long
[Plaintiff] c[ould] concentrate" (Docket Entry 14 at 9), and
supported the ALJ's finding that Plaintiff had moderate limitation
in CPP.

Second, Plaintiff criticizes the ALJ for "not discuss[ing] any
of the records addressing concentration." (Id. (emphasis added).)
More specifically, Plaintiff points to LPA Mansour's statement that
Plaintiff "is described as having difficulty with focusing, poor
concentration and attention, easily frustrated and angered with new
situations" (id. (quoting Tr. 799) (emphasis added)), as well as to
"Turning Point records [which] document that [Plaintiff] has an
extreme lack of focus" (id. (citing Tr. 514, 526, 530, 532, 534,

22

537, 539, 541, 543, 545, 551, 553, 565, 567, 570, 572, 575, 587, 601, 602, 604, 607, 614, 615, 628, 629, 652, 656, 659, 661, 669, 671, 679, 700, 702, 704, 711, 715, 717, 725, 740, 743, 745, 749, 751, 754, 764, 766, 768)).

Plaintiff's contention fails for two reasons. First, Plaintiff again relies on LPA Mansour's recitation of Plaintiff's subjective symptoms reports, rather than LPA Mansour's objective observations of Plaintiff during the examination (or other independent verification). Notably, LPA Mansour actually concluded that Plaintiff could sustain attention sufficiently to perform simple, repetitive tasks. (See Tr. 802.) Second, as discussed above, although the 2014-15 Turning Point records do reflect that Plaintiff then struggled with focus and attention, Plaintiff must show that he remained disabled as of his application dates in October and November 2016, and treatment records since mid-2015, which the ALJ did discuss (see Tr. 22-23), consistently reflected normal attention and concentration (see Tr. 429, 437, 445, 452, 459, 468, 475, 482, 489, 498, 506, 802, 917, 924, 974).

Third, Plaintiff faults the ALJ for failing to discuss how Plaintiff's PTSD, mood disorder, bipolar disorder, fibromyalgia, and hallucinations affect his concentration. (Docket Entry 14 at 9.) With regards to hallucinations, Plaintiff points to his "testi[mony] that constantly hearing voices is absolutely distracting." (Id. (citing Tr. 55).) The ALJ expressly referenced Plaintiff's "[PTSD], mood disorder, and bipolar affective disorder"

23

in her discussion of Plaintiff's ability to maintain CPP (Tr. 19) and, although the ALJ did not explicitly evaluate the impact of Plaintiff's fibromyalgia on his ability to maintain CPP, the ALJ did discuss Plaintiff's fibromyalgia treatment as part of her analysis of his RFC (see Tr. 23) and, in particular, Dr. Dearinger's observation that, despite objective signs of fibromyalgia symptoms on examination, Plaintiff had normal concentration (see Tr. 23-24; see also Tr. 786-96). Although Plaintiff did testify that he found hearing voices distracting (see Tr. 55), the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 24; see also Tr. 24-25 ("[Plaintiff]'s testimony at the hearing was not persuasive as to intensity, persistence and limiting effects of symptoms and not fully consistent with the medical record.")) and, as discussed below in the context of Plaintiff's third assignment of error, Plaintiff has not demonstrated error with respect to that finding.

In sum, Plaintiff has failed to point to record evidence that would have compelled the ALJ to find marked (or extreme) limitation in Plaintiff's ability to maintain CPP.

c. Adaptation/Self-Management

Regarding Plaintiff's ability to adapt/manage himself, the ALJ provided the following evaluation:

24

As for adapting or managing oneself, [Plaintiff] has a
<u>mild</u> limitation. There are no records from treating or
consultative sources showing consistent problems with
[Plaintiff]'s ability to regulate emotions, control
behavior and maintain well-being in a work setting. He
lives with his mother. He said he does not shower and
sometimes sleeps in his clothes several times per week.
He is often noted to have normal appearance and mood with
no evidence of trouble controlling his temper (see e.g.
Exhibit 9F). He has no recent inpatient hospitalization.

(Tr. 19-20 (emphasis added).) Plaintiff provides four rationales
to contest the ALJ's analysis, none of which provide the Court with
a basis to disturb the ALJ's adapation/self-management finding.

First, Plaintiff notes that "there are no records of
[Plaintiff]'s functioning in a work setting because he has no work
experience." (Docket Entry 14 at 10.) Plaintiff's effort to parse
the ALJ's chosen verbiage misses the mark, as the ALJ clearly
tracked the language from the applicable regulation, which defines
the ability to adapt and mange onself as including "the abilit[y]
to regulate emotions, control behavior, and maintain well-being <u>in
a work setting</u>," 20 C.F.R. Pt. 404, Subpt. P, § 12.00E.4 (emphasis
added). The ALJ's analysis conveys the salient point that he found
"no records from treating or consultative sources showing
<u>consistent</u> problems with [Plaintiff]'s ability to regulate
emotions, control behavior and maintain well-being." (Tr. 19
(emphasis added).) As discussed both above and below, the record
supports that observation by the ALJ.

Second, Plaintiff faults "the ALJ [for] cit[ing] Ex[hibit] 9
to support a finding of 'normal' appearance and mood," noting that

Exhibit 9 "consists of a single visit with a therapist on 5/19/16, three years prior to the Hearing[, and t]he therapist put an 'X' by the box indicating normal general appearance, an 'X' by the box indicating normal mood, and an 'X' by the box indicating normal interview behavior[] . . . [without] comments on these topics." (Docket Entry 14 at 10 (citing Tr. 973-75).) Plaintiff's argument, however, ignores the fact that the ALJ cited "[s]ee eg Exhibit 9" (Tr. 20 (emphasis added)), meaning "exempli gratia," or "for example." Thus, the ALJ did not rely on a single instance of normal appearance, mood, and behavior to support his moderate finding in this functional area. Indeed, consistent with the example singled out by the ALJ as representative of the record more broadly, most of the mental status examinations since mid-2015 reflect Plaintiff's normal appearance, mood, and/or behavior. (See Tr. 428-30, 444-46, 458-60, 488-90, 497-99, 505-07, 917-18, 923-24, 973.)

Third, Plaintiff points to LPA Mansour's finding that Plaintiff "'is described as having great difficulty tolerating changes in his routine as well as stress and pressures.'" (Docket Entry 14 at 10 (quoting Tr. 802) (emphasis added).) As discussed above, Plaintiff again misrelies on LPA Mansour's recitation of Plaintiff's subjective symptoms reports, rather than LPA Mansour's objective observations of Plaintiff during the examination (or other independent determinations). LPA Mansour neither made any

26

objective findings nor offered any opinions relating to Plaintiff's ability handle stress or pressure. (<u>See</u> Tr. 800-02.)

Fourth, Plaintiff maintains that "the Turning Point records show severe problems with [Plaintiff]'s ability to regulate his emotions and control his behavior in a structured academic setting." (Docket Entry 14 at 10 (citing Tr. 514, 520, 524, 526, 530, 541, 543, 545, 549, 551, 553, 555, 567, 570, 572, 574, 575, 578, 582, 585, 587, 598, 601, 602, 604, 607, 614, 615, 621, 628, 629, 652, 659, 698, 717, 751, 768)).) Although the 2014-15 Turning Point records show that, during that time period, Plaintiff had difficulty regulating his emotions, controlling his behavior, and maintaining his well-being, Plaintiff must show that his disability continued through his application dates in October and November 2016, and treatment records since mid-2015 consistently reflected Plaintiff's normal appearance, mood, and/or behavior. (<u>See</u> Tr. 428-30, 444-46, 458-60, 488-90, 497-99, 505-07, 917-18, 923-24, 973.)

Put simply, Plaintiff has not shown that the ALJ erred with regard to finding moderate limitation in Plaintiff's ability to adapt and manage himself. As a result, the Court should deny relief on Plaintiff's first issue on review.

### 2. Schizoaffective and Anxiety Disorders

Next, Plaintiff asserts that "[t]he ALJ committed error by failing to include schizoaffective disorder and anxiety disorder as

Case 1:20-cv-00624-CCE-LPA   Document 17   Filed 05/04/21   Page 27 of 39

severe impairments." (Docket Entry 14 at 12 (bold font and single-spacing omitted).) More specifically, Plaintiff maintains that he "has a psychotic disorder as defined by Listing 12.03 A" (id. at 13), and points out that he "has been hearing voices since his father died when he was eight years old" (id. at 12 (citing Tr. 1010)), that, "[a]t the hearing[, he] testified he still hear[d] voices" (id. (citing Tr. 54-55)), and that "[t]he Turning Point records also document hallucinations" (id. at 13 (citing Tr. 541)). Plaintiff further contends that he "has an anxiety disorder as defined by Listing 12.06 A" (id. at 15), and notes that, upon discharge from Central Regional Hospital on January 30, 2013, "his principal diagnosis was anxiety disorder, [no other specification ('NOS')]" (id. at 13 (citing Tr. 1542)), that LPA Mansour "affirmed anxiety, stating '[h]e does indicate that he can get really anxious when he has too much information to focus on[ and ] can get stressed and have anxiety attacks with shortness of breath and heart palpitations'" (id. (citing Tr. 799, 801)), that "UNC Psychiatry affirmed anxiety" (id. (citing Tr. 1467)), and that, "[a]t the hearing[, Plaintiff] described his anxiety" (id. (citing Tr. 52-54)). Plaintiff's arguments fall short.

a. Schizoaffective Disorder

As a threshold matter, at step two, the ALJ found Plaintiff's Asperger's disorder, PTSD, mood disorder, and bipolar affective disorder to constitute severe impairments, and found Plaintiff's Tourette's syndrome and obsessive-compulsive disorder non-severe

28

medically determinable impairments. (See Tr. 18.) Thus, the ALJ did not find that schizoaffective disorder qualified as even a medically determinable impairment, let alone a severe impairment. The ALJ did not err in that regard.

The Commissioner's regulations provide that a medically determinable impairment "must result from . . . psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques[ and, t]herefore, a . . . mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921 (emphasis added). In other words, a claimant's own "statement of symptoms" does not suffice "to establish the existence of a[ medically determinable] impairment[]." Id. (emphasis added).

Here, records from an inpatient psychiatric hospitalization in July 2012 at age 13 reflect a diagnosis of "[s]chizoaffective d[isorder], bipolar type v[ersus] schizophrenia" (Tr. 1010); however, at another hospitalization just a couple of months later, Plaintiff's diagnoses no longer included schizoaffective disorder (see Tr. 1019). More significantly, at an inpatient psychiatric hospitalization in October 2012, the provider made the following observations:

> [Plaintiff] claims that he has delusions and visual hallucinations and auditory hallucinations but declines to discuss them with me and does not seem to be affected by those delusions. He also mentions that he has split personality. He believes that he talks to people that are images of himself and that he creates situations that are not true and then he believes in them.

29

. . .

> Reason for admission was aggression, psychosis, mood dyscontrol. <u>We have not seen any of that throughout the hospitalization. [Plaintiff] came in and during his master treatment plan he insisted that his diagnosis should change to schizophrenia</u>. He said that he started by having bipolar disorder then the evolution was to schizoaffective but now he believed that he could be given a diagnosis of schizophrenia. <u>We never saw any symptoms and our understanding of that was that [Plaintiff] was made [to] believe that he was sick throughout his life</u>. He grew up in a dysfunctional environment and he did tell us later that he saw his mother being possessed by the demon and that step-dad was abusive and <u>he was always made [to] believe that he was crazy and delusional</u>.

(Tr. 1540 (emphasis added).) Plaintiff's diagnoses at discharge did not include schizoaffective disorder (or schizophrenia). (<u>See</u> Tr. 1542.)

Most importantly, <u>none</u> of Plaintiff's treatment records after July 2012 contain a diagnosis of schizoaffective disorder. (<u>See</u> Tr. 424, 433-34, 441-42, 463-64, 493-94, 502-03, 510-11, 819, 851, 858, 869, 874, 883, 888, 894, 905 (containing treating physician's diagnosis of "[m]ood disorder with <u>history</u> of psychosis" (emphasis added)), 915, 921, 934, 970-71, 979-80, 1599, 1610, 1622, 1635-44, 1648-49, 1652-53, 1656, 1682, 1692 (reflecting treating physician's diagnosis of "[u]nderlying mood disorder <u>previously characterized as bipolar affective disorder with psychosis</u>" (emphasis added)).)[7]

---

[7] A treatment record dated October 25, 2013, contains a diagnosis of "psychotic d[isorder NOS]" without accompanying explanation for that diagnosis (Tr. 1648), which neither appeared before nor appeared after that date in the ongoing treatment records of the Solutions Community Support Agency (<u>see</u> Tr. 1594-1677).

Moreover, LPA Mansour did not diagnose schizoaffective disorder (see Tr. 801-02), and the reconsideration-level state agency psychological examiner, whose opinions the ALJ credited (see Tr. 25), did not assess schizoaffective disorder as one of Plaintiff's mental impairments. (See Tr. 120-21.) Furthermore, although Plaintiff testified to experiencing ongoing hallucinations, his testimony alone does not suffice to establish schizoaffective disorder as a medically determinable impairment. See 20 C.F.R. §§ 404.1521, 416.921.

As Plaintiff has not shown "objective medical evidence from an acceptable medical source," 20 C.F.R. §§ 404.1521, 416.921 (emphasis added), that his schizoaffective disorder persisted past 2012, he has not shown that the ALJ erred by failing to categorize it as a medically determinable impairment, let alone a severe impairment.

b. Anxiety Disorder

Similar to schizoaffective disorder, the ALJ did not find that Plaintiff's anxiety disorder qualified as a medically determinable impairment. (See Tr. 18.) Even assuming, arguendo, that the ALJ erred in that regard, any such error remains harmless under the circumstances presented here. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). The ALJ clearly

31

acknowledged Plaintiff's anxiety symptoms (see Tr. 21 (containing ALJ's recitation of Plaintiff's testimony that he "has trouble making friends due to nervousness," "experiences anxiety attacks that cause numbness in his wrists and ankles," "becomes anxious when he becomes depressed and vice versa," and has "anxiety [] triggered by loud noises or being in a crowded place")), but evaluated them under Listing 12.15 for PTSD (see Tr. 19). Listings 12.06 and 12.15 contain the same paragraph B criteria, compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.06B, with id., § 12.15B, and, as discussed above, Plaintiff has not shown that the ALJ erred with respect to the paragraph B criteria findings. See Morrison v. Saul, No. 1:19CV413, 2020 WL 5111251, at *8 (M.D.N.C. Aug. 31, 2020) (unpublished) (finding any error by ALJ regarding Listing chosen to analyze mental impairment remained harmless, because "remand for the ALJ to analyze [the p]laintiff's intellectual deficits under Listing 12.05B would not result in a different outcome," where "Listings 12.05B and 12.11 share the same paragraph B criteria"), recommendation adopted, 2020 WL 5821077 (M.D.N.C. Sept. 30, 2020) (unpublished) (Osteen, Jr., J.).

In light of the above analysis, the Court should deny relief on Plaintiff's second issue on review.

### 3. Mental RFC

Lastly, Plaintiff maintains that "[t]he mental RFC is not supported by substantial evidence." (Docket Entry 14 at 15 (bold

32

font omitted).)  In particular, Plaintiff raises three arguments challenging the ALJ's mental RFC: 1) "[t]he ALJ failed to provide a logical bridge between the evidence cited and [RFC] conclusions reached" (id. at 16), 2) the ALJ "placed too much weight on there being no recent [inpatient psychiatric] hospitalizations" (id. (bold font omitted)), and  3) "the ALJ [] cherry[-]picked the evidence to support her conclusion" (id. at 18).  Those contentions fail to entitle Plaintiff to relief.

Plaintiff first asserts that "[t]he ALJ failed to provide a logical bridge between the evidence cited and [RFC] conclusions reached" (id. at 16) in two respects: 1) "[t]he ALJ cite[d] records" in her evaluation of the RFC, but "did not explain why she reached the conclusions she did," stating only that Plaintiff's "'testimony at the hearing was not persuasive as to intensity, persistence and limiting effects of symptoms and not fully consistent with the medical record'" (id. (quoting Tr. 24-25)), and 2) "[t]he ALJ mention[ed] hallucinations, but [neither] discuss[ed] the impact hallucinations ha[d] on [Plaintiff]'s ability to concentrate and interact with others," nor "discuss[ed] the synergistic effect the combination of depression, anxiety, PTSD and autism ha[d] on the severity of symptoms" (id.).

The ALJ's decision adequately explains why she did not find Plaintiff's testimony about his mental symptoms fully consistent with the record.  To begin, the ALJ provided more of an explanation for finding Plaintiff's testimony not fully consistent with the

33

record than Plaintiff's above-listed quotation alleges. (See Docket Entry 14 at 16 (quoting Tr. 24-25).) In fact, the ALJ explained as follows:

> [Plaintiff] experienced significant traumatic events during childhood after his father passed away, including his mother engaging in substance abuse and not having custody of [Plaintiff] for a time. Now, as an adult, he and his mother have repaired their relationship, she has stayed sober, and they support each other. There are no recent inpatient hospitalization for any mental impairment.

(Tr. 24.)

The ALJ additionally discussed medical evidence which showed that Plaintiff's mental symptoms began to stabilize in late 2014 and then remained stable from mid-2015 through the time of the ALJ's decision:

> [Plaintiff] began receiving medication management at Freedom House on November 4, 2014, which he felt to be helpful and kept him stabilized and out of the hospital.
>
> . . .
>
> Records from UNC Health Care on May 2, 2015, show [Plaintiff] was seen for psychiatry evaluation. His mood was depressed, but he had normal thoughts, orientation, attention, concentration, and memory. He had fair insight, judgment and impulse control. He had [PTSD]; mood disorder, [NOS]; and hypertension. On March 17, 2016, [Plaintiff] was dealing with stress considerably well and had started back for GED tests. He felt more independent and he was making good decisions. Notes show [Plaintiff] had a job and was doing really well. He denied suicidal ideation. His mental status examination was normal. [Plaintiff] was making friends. He was diagnosed with [PTSD], chronic; [PTSD] and Tourette's disorder. On May 19, 2016, [Plaintiff] was feeling less depressed.

(Tr. 22 (internal parenthetical citations omitted).)

34

The ALJ's discussion of the opinion evidence also supported the ALJ's mental RFC. In that regard, the ALJ afforded "great weight" to the reconsideration-level state agency psychological consultant (Tr. 25) who opined that, despite Plaintiff's mental impairments, he remained capable of simple, routine, and repetitive tasks with limited interaction with the general public (see Tr. 122, 127, 142, 147, 162, 167). The ALJ also accorded "partial weight" to LPA Mansour's opinions, explaining further as follows:

> . . . it is vague in degree of limitations, though finding that he can understand, remember and follow instructions is consistent with evidence of no limitation in understand, remember and apply information, can sustain attention to simple tasks and "likely has some awkward mannerisms that could cause some issues relating to coworkers and supervisors" is vague but with other evidence, supports occasional interaction with coworkers and no interaction with public.

(Tr. 25.) As the Court can trace the path of the ALJ's reasoning from the evidence to the mental RFC findings, Plaintiff has not shown that "[t]he ALJ failed to provide a logical bridge" (Docket Entry 14 at 16).

Regarding hallucinations, the ALJ did discuss Plaintiff's claim that "[h]e begins hearing voices in his head telling him to run away or hurt himself" and "hears voices that say things that upset him" (Tr. 21), but found his testimony not fully consistent with the record (see Tr. 24), and Plaintiff has not shown error with respect to that finding. Moreover, the ALJ found moderate limitations in Plaintiff's ability to interact with others and to maintain CPP (see Tr. 19), and Plaintiff simply has not shown that

35

the evidence relating to his hallucinations should have compelled the ALJ to adopt greater restrictions.

Plaintiff's assertion that the ALJ failed to "discuss the synergistic effect the combination of depression, anxiety, PTSD and autism ha[d] on the severity of symptoms" (Docket Entry 14 at 16) fares no better. At step three, the ALJ found that "[t]he severity of [Plaintiff]'s mental impairments, considered singly and in combination, d[id] not meet or medically equal the criteria of listings 12.02, 12.04, 12.10, and 12.15" (Tr. 19 (emphasis added)) and, in formulating the RFC, the ALJ indicated that he had "careful[ly] consider[ed ] the entire record" (Tr. 20 (emphasis added)). Absent evidence to the contrary (not adduced here), the Court may take the ALJ at her word. See Reid, 769 F.3d at 865 (holding that, if "the ALJ . . . stated that the whole record was considered, . . . absent evidence to the contrary, we take her at her word").

Next, Plaintiff objects to the ALJ's reliance on the lack of recent inpatient psychiatric hospitalizations in formulating the mental RFC. (Docket Entry 14 at 16-18.) As to that matter, Plaintiff notes that "[t]he primary reason for a psychiatric hospitalization is the individual represents an immediate suicidal or homicidal risk," and points out that "[a] person can have a disabling mental disorder and at the same time not be suicidal or homicidal." (Id. at 17.) Thus, Plaintiff argues that his testimony that "he [wa]s no longer experiencing significant

36

suicidal or homicidal ideation" does not preclude a finding of mental disability, and that "[t]he only logical inference to be derived from no recent hospitalizations is that [Plaintiff] ha[d] not recently been suicidal or homicidal." (Id. at 17.) The lack of recent inpatient psychiatric hospitalizations does not, in an of itself, disprove mental disability. However, the ALJ did not rely solely on the absence of such hospitalizations in determining the mental RFC, nor did she find that such absence meant that Plaintiff lacked severe mental impairments or any limitations arising out of those impairments. Rather, the ALJ found that the lack of such hospitalizations constituted evidence, along with other factors in the record, showing that Plaintiff's mental symptoms stabilized after mid-2015. (See Tr. 24.) The ALJ did not err in that regard.

Plaintiff further contends that "the ALJ used a negative (the lack of hospitalizations) to prove a positive (medical improvement)" and, "[a]lthough this assertion is not impossible, . . . [t]here are several more plausible explanations for [Plaintiff] not being hospitalized since he was sixteen." (Docket Entry 14 at 17.) According to Plaintiff, "a more reasonable explanation for there being no recent hospitalizations is that [Plaintiff] was traumatized by past hospitalizations." (Id. at 18.) Plaintiff further emphasizes that he experienced "panic attacks every time he le[ft] his house," and "seclude[d] himself in his bedroom because it [wa]s the safest place he kn[ew]." (Id. (citing Tr. 1011).) Plaintiff's argument glosses over the fact

37

that, although Plaintiff may opt against attending therapy, as he testified at the hearing (see Tr. 58-59), involuntary commitment for psychiatric reasons does not constitute a matter a choice. If Plaintiff had continued to engage in the kind of aggressive and violent behavior that lead to his earlier hospitalizations, he likely would have faced involuntary commitment. Those considerations bear relevance to the ALJ's assessment of the continuing severity of Plaintiff's symptoms. For the same reasons, Plaintiff's reliance on his panic attacks to explain the lack of hospitalizations falls short. Moreover, the record reflects that Plaintiff's panic attacks did not prevent him from going on walks and attending regular medical appointments, church, shopping excursions, and social gatherings. (See Tr. 49-50, 61, 316, 317, 428, 444, 770, 916.)

Finally, Plaintiff faults the ALJ for cherry-picking the evidence to support the mental RFC. (Docket Entry 14 at 18.) However, in that same paragraph, Plaintiff notes that "[t]he ALJ concluded that Plaintiff c[ould] perform Light work" (id. (emphasis added)), i.e., an exertional component of the physical RFC rather than a non-exertional component of the mental RFC, and then failed to provide any support for the assertion that the ALJ "cherry[-]picked" the evidence (id. at 18-19). That failure precludes relief on this front. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."

38

(internal quotation marks omitted)); <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

Under these circumstances, Plaintiff's third assignment of error lacks merit.

### III.  CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 4, 2021

39